**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIE ELLEN SHROUT, | ) | CASE NO. 1:22-CV-01668-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I. Introduction

Plaintiff, Marie Ellen Shrout ("Shrout" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II. Procedural History

### A. July 2015 Application

On July 17, 2015, Claimant filed an application for DIB, alleging a disability onset date of January 12, 2015. (ECF No. 8, PageID #: 139). Her application was denied initially and on reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ").

1

(*Id.*).  On January 24, 2018, an ALJ held a hearing during which Claimant, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*).  On March 21, 2018, the ALJ issued a written decision finding Claimant was not disabled.  (*Id.* at PageID #: 136-56). Claimant requested review by the Appeals Council and on January 16, 2019, the Appeals Council remanded the case to an ALJ because 1) the finding that Claimant had no severe physical impairments was not supported by the medical record; 2) the ALJ found Claimant could "perform simple tasks consistently and more complex tasks occasionally" with infrequent changes explained in advance but found she could perform past relevant work that required "frequent changes of tasks" and the hearing testimony did not address this conflict; and 3) a "significant amount of medical evidence" was not considered.  (*Id.* at PageID #: 164-66).

The same ALJ held a supplemental hearing on June 5, 2019, at which both Claimant and an impartial VE testified.  (*Id.* at PageID #: 51).  On July 24, 2019, the ALJ again issued a written decision finding Claimant was not disabled.  (*Id.* at PageID #: 48-80).  The ALJ's decision became final on May 29, 2020, when the Appeals Council declined review.  (*Id.* at PageID #: 37-39).  Claimant appealed to the United States District Court for the Northern District of Ohio and, on July 14, 2021, based on the parties' stipulation, United States District Judge Patricia A. Gaughan remanded the matter to the Commissioner for further proceedings. (*Id.* at PageID #2855).

## B.  June 2020 Applications

On June 23, 2020, Claimant filed applications for DIB and SSI, alleging a disability onset date of January 1, 2015.  (ECF No. 9, PageID #: 6329).  The June 2020 applications were denied initially and upon reconsideration, and Claimant requested a hearing before an ALJ.  (*Id.*).  On

May 3, 2021, a second ALJ held a telephonic hearing, during which Claimant and an impartial VE testified. (*Id.*at PageID #: 6329-30). On May 27, 2021, the second ALJ issued a written decision finding Claimant was not disabled. (*Id.*at PageID #: 6326-43). The Appeals Council granted Claimant's request for review, vacated the second ALJ's decision, and remanded for further proceedings. (ECF No. 8, PageID #: 2859). The Appeals Council ordered the ALJ to "consolidate the current and subsequent claims files, associate the evidence, and issue a new decision on the consolidated case." (*Id.*). The Appeals Council specified that the case should not be assigned to the first ALJ. (*Id.*).

### C. Post-consolidation Proceedings

On March 14, 2022, a third ALJ held a telephonic hearing, during which Claimant and an impartial VE again testified. (ECF No. 8, PageID #: 2715). On June 22, 2022, the third ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 2709-51). Because Claimant did not seek review from the Appeals Council, the ALJ's decision became final sixty-one days later on August 22, 2022. (*See* ECF No. 1 at 2; *see also* ECF No. 8, PageID #: 2710).

On September 19, 2022, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1.) The parties have completed briefing in this case. (ECF Nos. 11, 12, 14). Claimant asserts the following assignments of error:

(1) The ALJ erroneously failed to comply with the previous order of the Appeals Council when she failed to provide sufficient rationale in support of the assessed limitations in the RFC.

(2) The ALJ committed harmful error when she failed to find that Plaintiff satisfied the criteria of Listing 8.05 at Step Three of the Sequential Evaluation.

3

(3) The ALJ committed harmful error when she failed to adequately explain why she failed to give controlling weight to the opinions of the treating sources in violation of 20 C.F.R. § 404.1527.

(ECF No. 11-1 at 1).

## III. Background

### A. Relevant Medical Evidence

The ALJ summarized Claimant's health records and symptoms:

Upon her release from prison on January 11, 2015, the claimant was described as having a normal mood and affect, normal behavior, and normal judgment (see Ex. 3F, p. 30).

The claimant did not receive any medical treatment until May 5, 2015 when she presented for a mental health evaluation. At that time, she was described as being cooperative, engaged, and having good eye contact (see Ex. 2F, p. 4). The claimant was further described as having good grooming and hygiene. (Id.). The claimant's mood was also described as being good, and she was described as having intact concentration, and a good fund of knowledge. (Id.).

The claimant was psychiatrically hospitalized between May 25, 2015 and June 4, 2015 due to suicidal ideations without a plan. She reported that this was the first time she was prescribed medications (see Exs. 3F, p. 33; and 4F, pps. 5, 10, 36, and 40). . . . The claimant was described on May 25, 2015 as having a normal gait, normal muscle strength, and normal muscle tone (see Ex. 4F, p. 7).

On May 26, 2015, the claimant denied having any joint pain, joint swelling, back pain, or muscle pain (see Ex. 4F, p. 19). The claimant was also described on May 26, 2015 as having a normal gait, normal reflexes, and intact sensation. (Id.).

The claimant was described on June 4, 2015 as having normal musculoskeletal motion, normal reflexes, and no swelling in her lower extremities (see Ex. 3F, p. 32). However, she did have psoriatic plaques concentrated on her forearms. (Id.). The claimant was also described as not being in any distress, and as having a normal mood and affect. (Id.). The claimant was further described as having an appropriate thought process, and good orientation, insight, and judgment. (Id.). She was also described as having sustained concentration, attention, and good fund of knowledge. (Id.).

4

At an appointment on June 18, 2015, the claimant was described as being adequately groomed, cooperative, and properly oriented (see Ex. 3F, p. 34). The claimant was further described as having intact recent and remote recall, sustained attention and concentration, and a good fund of knowledge. (Id.). The claimant was also described as having clear speech, an appropriate thought process, and good insight and judgment. (Id.).

It was noted on July 6, 2015, that the claimant was able to do chores and engage in programs at the shelter she was at (see Ex. 13F, p. 27). She even received an award for cleanliness (see Ex. 13F, p. 109). She also reported wanting to stay on her medications because she liked the way they made her feel (see Ex. 13F, p. 32). Her therapy was largely geared toward developing healthy coping skills, and her therapist's notes reflect progress in that regard (see Ex. 13F, p. 59). The claimant reported that she liked counseling and was able to use her coping skills to decrease her anxiety and depression (see Ex. 13F, p. 57).

The claimant was described on July 9, 2015 as not having any lower extremity swelling and as being neurologically intact (see Ex. 6F, p. 14). The claimant was also described as not being in any distress (see Ex. 6F, p. 13).

The claimant was described on July 13, 2015 as having a good mood and euthymic affect (see Ex. 2F, p. 4). She was further described as being cooperative, calm, engaged and having good eye contact. The claimant had a normal thought process without suicidal or homicidal ideations, hallucinations or delusional thinking. Notably, the claimant's concentration was intact and she had fair to good insight and fair judgment. (Id.). The claimant endorsed anxiety related to PTSD, but no depression, and indicated that she was compliant with her medications. She was diagnosed with stable major depressive disorder and stable PTSD, and she was restarted on Trazodone (see Ex. 2F, pps. 7 and 8).

The claimant began complaining of right arm problems in late July 2015. More specifically, she was treated emergently on July 28, 2015 for right arm pain that she had been having for two to three days (see Exs. 4F, p. 2; and 6F, p. 11). The claimant denied having any myalgias, arthralgias, back pain, joint swelling, or problems walking (see Ex. 4F, p. 3). The claimant was described as not being in any distress, and as having normal musculoskeletal motion, and as having a normal mood and affect, and normal behavior. (Id.). She was diagnosed as having tendinitis in her right elbow. (Id.).

At a follow up appointment on July 29, 2015, the claimant had full extension

of her right elbow and mildly reduced flexion (see Ex. 6F, p. 11). The claimant, who weighed 258 pounds, also was described as not being in any distress. (Id.).

The claimant sought treatment for right arm pain on August 3, 2015 (see Ex. 6F, p. 9). Of note was the fact that the claimant complained of pain when she rotated her right shoulder and elbow. (Id.). The claimant also complained of tenderness when her right arm was manipulated. (Id.). In terms of objective signs, the claimant was described as being alert, cooperative, and in no distress. (Id.). She was diagnosed with a right upper arm strain and uncomplicated diabetes. (Id.).

The claimant sought treatment for right shoulder pain on August 12, 2015, which she said might have been related to her using a mop and bucket at the shelter where she was living (see Ex. 6F, p. 6). The claimant was described as having decreased right shoulder range of motion but no tenderness, swelling, or deformity. (Id.).

On August 28, 2015, a rheumatologist said the claimant had some "mild" triggering of her right 3rd and 4th fingers (see Ex. 7F, pps. 5 and 7). The claimant was further described as having a Dupuytren's contracture of the right hand and a hint of one in the left hand. The claimant was also described as having "slightly decreased" right shoulder motion, full range of motion of her elbows and wrists, and an equal grip strength (see Ex. 7F, p. 7). This source also said he did not believe the claimant had psoriatic arthritis. (Id.).

On August 31, 2015, a right shoulder x-ray was unremarkable (see Ex. 7F, pps. 11, 12, and 21). She was diagnosed with right shoulder tendonitis (see Ex. l0F, p. 31).

The claimant's depression, and PTSD were noted to be stable in September 2015 (see Ex. 13F, p. 75). She reported having intermittent low mood swings, but denied depression and was compliant with her medication. The claimant reported continued anxiety triggered by witnessing abuse at her transitional living facility. She also reported difficulty with sleep and her medication was adjusted. Notably, the claimant was able to help care for an elderly resident she was living with, but noted needing a breather at times to take care of herself. She was found to be at low risk for self-harm. Subsequent notes from October 2015 through June 2016 continued to show stable depression and PTSD with stable mood (see Ex. 13F, pps. 90, 108, and 128).

On October 2, 2015, the claimant said she did not have any problems walking or any numbness or any memory problems (see Ex. 1 lF, p. 4). The

6

claimant, who weighed 266 pounds, was also described as being neurologically intact, pleasant, and in no distress. (Id.).

At an appointment on October 14, 2015, the claimant described herself as "doing well" (see Ex. 1 lF, p. 10). She expressly denied having any muscle weakness, gait problems, numbness, burning pain, tremor, or memory loss. (Id.). The claimant also denied having any sleep problems, anxiety, depression, memory loss, disorientation, or inattention. (Id.). The claimant was also described on this date as not having any skin lesions. (Id.).

The claimant sought treatment on January 19, 2016 for back and right shoulder pain that she attributed to "working and lifting using cleaning tools in housekeeping" (see Ex. l0F, p. 26).

The claimant sought treatment on January 26, 2016 because of left knee pain (see Ex. l1F, p. 13). Again, she was described as not being in any distress. (Id.). She was also described as having a normal gait, "good range of motion and strength," and being neurologically intact (Id.). Based upon fluid being seen in an MRI of her right knee, the claimant was described as having traumatic bursitis in addition to a knee contusion (see Ex. 1 lF, p. 14).

The claimant sought treatment on February 8, 2016 for nodules on both of her hands that she said she had had for years that were growing in size (see Ex. l1F, p. 15). The claimant said she had no numbness or tingling in either hand. She also denied having symptoms "specific locking or clicking consistent with trigger finger." (Id.). "She has no difficulty using her hands... other than some tenderness in one of the nodules on her right hand." (Id.). The claimant was described as not being in any distress (see Ex. l1F, p. 17). She was also described as not having any remarkable hand features except for an early collagen cord extending from the mid-palm towards the right finger, but with no contracture and with full range of motion, with no palpable nodule, clicking, or locking in her fingers. "There is no PIP or MP contracture[s], she has full finger range of motion through flexion and extension.  The disease is more hands on the right than on the left. Median and radial and ulnar motor and light touch sensation is intact and equal. Full wrist range of motion...no clicking or locking on examination today all fingers." (Id.). The claimant was assessed as having "early bilateral Dupuytren's disease." (Id.). The claimant was also treated with a steroid injection into the nodule on her hand. (Id.).

The claimant again complained of right shoulder pain on April 7, 2016 which she said was possibly caused by her sleeping on it wrong (see Ex. l1F, p. 28). The claimant denied on this date having any issues involving her skin. (Id.). She also said she was not experiencing any tingling or numbness.

(Id.). The claimant was described as having normal musculoskeletal motion, no swelling, and not being in any distress (see Ex. 1lF, p. 30).  However, she had "tenderness with deep palpation" of the right shoulder as well as a palpable spasm. (Id). The claimant, who did not have any skin rashes, was further described on April 7, 2016 as having normal behavior, and a normal mood and affect. (Id.).

The claimant next sought treatment on May 9, 2016 for a right middle finger trigger finger (see Ex. 1lF, pps. 32 and 33). The claimant described the pain she experienced in the joint at a "3" on a "zero to ten" pain scale (see Ex. 1 lF, p. 32). The claimant was described as not being in any distress, and as having no MP or PIP contracture[s], or locking or clicking of her fingers (see Ex. 1 lF, p. 33). However, curling of the ring and small finger was noted on the right hand (see Ex. 1lF, p. 32). The claimant's left hand was unremarkable except for a nodule on her palm. (Id.). The claimant was diagnosed as having "very early mild right middle finger trigger finger," and she was given a splint to wear for six weeks. (Id.). She also received steroid injections into the nodules on her hands (see Ex. 1lF, p. 33).

At an appointment on May 13, 2016, the claimant was described as being cooperative and in no distress (see Ex. 1lF,  p. 35).

At an appointment on May 11, 2016, the claimant was described as having normal strength in her upper and lower extremities, and as being neurologically intact (see Ex. 1lF, p. 39).

The claimant was described as not being in any distress at appointments on May 18, 2016 (see Ex. 1lF, p. 45) and May 19, 2016 (see Ex. 1lF, p. 43). On this latter date, the claimant was noted to have a psoriatic rash on her chest and stomach. (Id.).

The claimant was described on June 6, 2016 as having "very mild" Dupuytren's disease (see Ex. 1 lF, p. 51 or 61). Although the claimant complained of some clicking in her right ring finger, she was described as "still [having] a zero- degree contracture at the MP and PIP joints." (Id.). "Full range of motion. Bilateral digital nerves intact...no active clicking or locking on examination today." She had an injection in her right middle finger, which she indicated significantly decreased the size of the nodule. (Id.). She wore trigger finger splints at night, which she indicated was helping significantly with her symptoms (Ex. 1lF, p. 51).

At an appointment on June 21, 2016, the claimant was described as not being in any distress (see Ex. 1lF, p. 62).

8

The claimant, who fractured her left forearm in July 2014 (see Exs. 3F, p. 26; and 7F, p. 10), sought treatment on August 8, 2016 for left wrist pain (see Ex. 1lF, p. 67).  An x-ray of the left upper extremity showed a severe deformity involving the distal ulna bone "which may be developmental or may suggest post-traumatic deformity of the radial shaft. There is no acute fracture or dislocation" (see Ex. 1lF, p. 67).  The claimant was described as complaining of pain when her left wrist was rotated. (Id.). The claimant was also described as being cooperative, in no distress, and being neurologically intact (Id.). Her right elbow x-ray was normal (Ex. 1lF, p. 209). Her physical examination showed limited range of motion of her right wrist and tenderness in her forearm (Ex. 1lF/57). Examination of her left wrist showed tenderness to palpitation of the distal third ulnar shaft, but she was had full and painless wrist and finger range of motion (see Ex. 14F, p. 5). She was conservatively treated with Ibuprofen, Naprosyn, and splints (see Exs. 1lF, p. 58; and 14F, p. 39).

In August 2016, the claimant had injections in her right ring finger Dupuytren's nodule with good results as it softened nicely (see Ex. 1 lF, p. 5 5). Her physical examination showed tenderness and subjective decreased sensation in her hands, but full range of motion in her fingers and no trigger or locking. She presented with weakness, pain, and tenderness of the wrist and lateral epicondyles. She also had a positive Tinel's sign over the cubital and carpal tunnels, but negative median nerve compression test. She was diagnosed with right cubital tunnel syndrome and lateral epicondylitis. However, her right middle finger trigger finger was resolving. She was conservatively treated with activity modification stretching and advised to use a blanket to help her sleep with an extended elbow (see Ex. 1lF, p. 55).

In September 2016, the claimant reported having an unstable mood and was diagnosed with bipolar disorder (see Ex. 13F, p. 155). She reported increase in her PTSD after being contacted by an abuser on Facebook, but denied impulsivity and substance abuse.

The claimant was described on October 5, 2016 as not being in any distress and as being neurologically intact (see Ex. 14F, p. 21). There are also visits with Dr. Grady, her podiatrist, who documented a loss of protective sensation but never documented an abnormal gait or other dysfunction. In addition, Dr. Grady did not recommend the need for an ambulatory device (see for example, Exs. 25F, pps. 114, 201, 296, 304, 342, and 343; and 28F, p. 137).

At an appointment on October 27, 2016, the claimant was described as not being in any distress and as being neurologically intact (see Ex. 14F, p. 31).

9

In October and November 2016, the claimant reported that her mood swings had evened out a bit due to the increase in Seroquel. She indicated that she was sleeping better. The claimant reported intrusive thinking about past relationship trauma, which disrupted her concentration. She reported being worried about housing, but indicated that overall her anxiety was under control. She also denied having side effects from her medications (see Ex. 13F, pps. 171 and 183).

The claimant complained of back and neck pain on November 14, 2016 but no numbness, tingling, weakness, or gait abnormalities (see Ex. l0F, pps. 7 to 9). Her physical examination showed limited range of motion in her lumbar spine and poor hamstring flexibility, but normal upper and lower extremity strength and negative straight leg raising tests bilaterally (see Ex. l0F, p. 10).

In January 2017, the claimant reported that she was compliant with her medication and was doing "way" better because she was able to keep a stable job and was off probation (see Ex. 13F, p. 198). . . .

The claimant sought treatment on March 20, 2017 because her psoriasis was flaring on her left hand and both of her feet, complaints that were documented on examination (see Ex. 12F, pps. 4 to 6). Consequently, the claimant said she was having problems walking (see Ex. 12F, pps. 4 and 5). The claimant expressly denied having any musculoskeletal problems (see Ex. 12F, p. 6). The claimant also denied suffering from any mental health problems. (Id.).

At an appointment on April 4, 2017, the claimant was described as not being in any distress and as being neurologically intact (see Ex. 14F, p. 50).

At an appointment on April 21, 2017, the claimant denied having any neck pain, back pain, weakness, or numbness (see Ex. 14F, p. 58). The claimant was described as being pleasant and in no distress (see Ex. 14F, p. 59). The claimant was also described as having good eye contact and as having a normal affect. (Id.). The claimant was also described as having psoriatic plaques on her palms and feet. (Id.).

On April 22, 2017, the claimant denied having any problems walking (see Ex. 14F, pps. 67 and 94). The claimant also denied having any muscle weakness or numbness, (Id.). The claimant also denied having any arthritic pain, joint pain, joint swelling, or body aches. (Id.). The claimant also said she was not suffering from depression or anxiety or memory problems or inattention. (Id.). However, the claimant continued to have psoriatic plaques on her palms and feet, and she was hospitalized because of this through April 25, 2017 (see

10

Ex. 14F, pps. 65, 66, 81, 85, and 106). Upon examination, the claimant was described as being neurologically intact (see Ex. 14F, pps. 85 and 90).

The claimant was described on April 27, 2017 as being neurologically intact and in no distress (see Ex. 14F, p. 194).

The claimant was described on May 2, 2017 as having intact motor functioning (see Ex. 14F, p. 200).

The claimant sought treatment on May 9, 2017 for pain in her hands and feet (see Ex. 14F, pps. 214 and 215). She saw a dermatologist for the plaques that developed from a psoriasis flare. The dermatologist stated that her "obesity does not help with her feet" (see Ex. 25F, p. 249). The claimant also said she was having some locking of one of the fingers on her left hand. (Id.). Significantly, the claimant had full range of motion in both shoulders, elbows, wrists, and fingers. (Id.).

The claimant was described on May 30, 2017 as being neurologically intact and in no distress (see Ex. 14F, p. 240).

The claimant reported at other times in May 2017 as having no gait disturbance, numbness or burning pain (see Ex. 14F, pps. 67, 75, 84, and 253).

The claimant was described on June 3, 2017 as having a normal gait, normal muscle strength, and normal sensation (see Ex. 14F, p. 254).

The claimant was described on June 12, 2017 as being neurologically intact and in no distress (see Ex. 14F, p. 277).

The claimant was described on June 29, 2017 as being neurologically intact and in no distress (see Ex. 15F, p. 7). The claimant also complained of pain in the fingers of her right hand (see Ex. 15F, p. 13). Upon examination, the claimant was described as not having any clicking or locking of her fingers. (Id.).

The claimant was described on July 13, 2017 as being neurologically intact and in no distress (see Ex. 15F, p. 24).

The claimant was described on October 26, 2017 as having full range of motion of all fingers and no contractions (see Ex. 15F, p. 73). The claimant's psoriasis was also described as being "greatly improved." (Id.). Because of her complaints of right elbow pain, it was also discussed on October 26, 2017 that the claimant could have cubital tunnel syndrome surgery once she got her

11

diabetes under better control. (Id.).

The claimant was described on December 5, 2017 as being neurologically intact and as not being in any distress (see Ex. 16F, p. 3).

The claimant was described on December 6, 2017 as having reduced sensation in her toes but normal DP and PT pulses bilaterally (see Ex. 16F, p. 14).

The claimant described herself on December 8, 2017 as not having any back or neck pain, or a dysphoric mood, or anxiety (see Ex. 16F, p. 31). The claimant was also described on December 8, 2017 as having a normal gait, and as having good eye contact, and as being cooperative (see Ex. 16F, p. 33).

Also, in December 2017, the claimant's hand examination showed early cords to the middle finger and ring finger, but no flexion contracture, full finger range of motion and intact bilateral digital nerves. There was also mild tenderness, but normal 5 / 5 bicep strength with full range of motion (see Ex. 15F, p. 73). The claimant was told that she was a candidate for right cubital tunnel and right hand fasciectomy. However, her poor diabetes control would need to improve prior to having any elective surgery (see Ex. 15F, p. 73).

A right finger x-ray from January 2018 showed some soft tissue swelling of the third finger, but no underlying acute osseous abnormality (see Ex. 16F, pps. 67 and 68).

The claimant was described on January 28, 2018 as having a less than 10-degree MP contracture of her right middle finger, and no contraction of the PIP joint (see Ex. 16F, p. 63).

The claimant's diabetes was described on February 6, 2018 as having improved (see Ex. 16F, p. 69). It is noted that for many of her visits she denied checking her glucose levels and was unable to provide information about her glucose levels. She reportedly had not checked her glucose levels before her appointments-even when the appointments were late in the afternoon. (see, for example, Exs. 25F, pps. 114, 200, 304, and 343; and 28F, pps. 23 and 200).

The claimant was also described as having mild chondromalacia in her left knee and a meniscus tear. (Id.). The claimant was also described as being neurologically intact, in no distress, and having appropriate behavior (see Ex. 16F, p. 72).

The claimant had a right cubital release, finger mass removal and fasciectomy of the palmar central cord of the right ring finger surgery on February 27, 2018 with no complications (see Exs. 16F, pps. 92 to 95; and 16F, pps. 128 and 132).

The claimant described herself on March 15, 2018 as having "minimal complaints related to the right upper extremity. She has significant improvement [with] elbow pain and she no longer has any shooting type sensation. Numbness feeling improved as well" (see Ex. 18F, p. 21). The claimant's surgeon, Dr. Chepta, also said that the claimant had "no restrictions regarding the right upper extremity" (see Ex. 18F, p. 22).

The claimant sustained a left humerus fracture in a domestic violence incident on March 12, 2018, a fracture that was surgically corrected (see Exs. 18F, pps. 31, 45, and 46). On June 4, 2019, in a follow up visit with orthopedics, she reported that she did not attend physical therapy because her arm started feeling better. (Ex. 2 SF/ 64) Instead, her primary concern was that "over the last several weeks, she has developed an exertional chest discomfort." She initially thought it was from her shoulder, but has since reconsidered that. She placed a call to her PCP requesting a walker "because she wanted a place to rest while she was walking." She denied any new trauma or injury, no cardiac history. (E. 2 SF/ 64)

The claimant was described on August 3, 2018 as being neurologically intact and as not being in any distress (see Ex. 19F, p. 32).

The claimant's left humerus fracture was described on March 11, 2019 as having "routine healing" (see Ex. 23F, p. 14). The claimant was also described on March 11, 2019 as being neurologically intact, cooperative, in no distress, and as having good left shoulder motion, and appropriate behavior. (Id.). The claimant also described herself on March 11, 2019 as not suffering from any mental health problems. (Id.). It was also decided on March 11, 2019 that the claimant would start physical therapy for her healing left humerus fracture.

The claimant was described on June 3, 2019 as being neurologically intact and as having normal motor function, normal sensation, and no rashes on her skin (see Ex. 23F, p. 48).

(ECF No. 8 at PageID #: 2727-36).

The ALJ noted that Claimant "has received relatively limited medical treatment since

13

June 3, 2019 for these conditions." (*Id.* at PageID #: 2736). Later in the decision, the ALJ

detailed additional medical evidence:

> July 23, 2020 a note with the cardiology consult service documents her report of "sharp chest discomfort and upper back for a year. typically last 5 mins may occur with activity or rest. Has pain intermittently, none in pat 2-3 weeks. Has associated sob, every once in a while, sweats. No hx of ml, stroke." (Ex. 27F/ 40) Examination noted a neurologically intact and symmetric result (Ex. 27F / 42) She exercises to 4.8 M, 82% mphra, no chest pain, equivocal ST changes. She had moderate ischemia in the left anterior descending artery territory at the ape and normal left ventricular size and systolic function. (Ex. 27F/ 44)
>
> On August 7, 2020, the claimant was seen for evaluation after having an abnormal stress test. She reported then a "history of exertional chest pain lasting for 5 to 10 minutes for past one year." (Ex. 27F/29] A 10 point review of systems was negative except for that she reported in her history: i.e., no numbness or tingling in her feet or loss of balance due to same. The brief exam that was conducted documented normal extremities, no deformities, edema or skin discoloration. She had positive radial and popliteal peripheral pulses. She was assessed as having moderate ischemia in the left anterior descending artery and normal left ventricular size and systolic function. A sedation assessment noted she was ASA Classification Class II-defined as an individual with one system well controlled disease. Disease does not affect daily living. (Ex. 27F/ 32) She was deemed appropriate for a cardiac catheterization procedure. The reason given for the procedure was "worsening angina, abnormal stress test." (Ex.27F/ 34) She denied palpitations, SOB, chronic leg swelling, hx of PE or DVT. She reported not being very active and "uses a walker for ambulation. She feels she is able to walk a mile at her own pace." (Ex. 27F/ 35) When examined, her extremities had pedal pulses, and no varicosities. Neurologically, her gait was not assessed but she did not have any focal deficits noted. (Ex. 27F / 38) She also reported that she was still smoking and had a July 2020 HbAlc of 13, though she was being "more compliant with meds …." Blood sugars were in the 411 range in the past two weeks and her morning glucose was averaging 150. Id. During a preoperative evaluation, in September 2020, she was documented as having no neurological deficits. (Ex. 28F / 31) Also from a cardiac standpoint, even though she had coronary artery disease in three vessels that required intervention, as per an Echocardiogram performed on August 7, 2020, her ejection fraction remained within normal limits of 65% with no significant valve disease. (Ex. 28F/ 30-31)
>
> . . .
>
> [O]n August 12, 2021, the claimant sought treatment from the Metrohealth

14

Physical Medicine and Rehabilitation Clinic for complaints of chronic low back pain. (Ex. 32F / 165- 172) While her physical examination findings documented some reduction in function, none of them were of such a significant measure as to preclude her ability to perform the actions or movements tested on that date. Moreover, none of the clinical findings were of such a degree as to merit any greater treatment than physical therapy with home exercises. For example, her skin was intact, no erythema no ecchymosis or rash. Thus, she did not have any active psoriasis to impact her ability to use her upper extremities. Her pelvis was symmetric, and the lumbar lordotic curve was normal. "There was no evidence of scoliosis. ROM was moderately decreased in all planes. Palpatory exam revealed tenderness at the lumbosacral junction. There was no evidence of spasm. There was no evidence of any trigger points. SLR was negative bilaterally. Provocative testing was negative." Her neurological exam also confirmed her retention of significant functional abilities despite her allegations. Her reflexes were 2+ bilaterally in the lower extremities with downgoing plantar responses. "Motor strength was normal in all myotomal regions bilateral lower extremities. Fine motor coordination was normal." The final significant finding on this date in 2021, was the finding that her gait was only "slightly antalgic." She was not using an assistive device when she was seen which is about one year after her CABG … She was referred to physical therapy "to improve back pain and core strength/ram and progress to HEP." She was given a "Care of the Back booklet" and was instructed "to perform daily progressive HEP." A "trial of Robaxin 500 mg" was also given to her with instructions to return in two months. ( Ex.32F/ 171)

Recently, on February 23, 2022, the claimant had an initial consult examination with Leon Rosenberg, MD at MetroHealth complaining about a loss of feeling and shooting burning pain in her feet along with numbness and paresthesia and other complaints which are worse with ambulation. Work up noted a normal B12 and TSH, an EMC over 6 years ago and a recent HgbAlc test of 11.1 He also documented her apparent report that she had been "denied disability 6 times." (Ex. 34F / 38) On physical examination, the claimant was not in any acute distress, and her extremities had no edema with well healed vein donor sites. Neurologically, she was alert, oriented, responsive and appropriate with fluent speech without aphasia, dysarthria or apraxia. Sensorium was intact with normal attention and concentration though he inferred she had a low IQ based on her vocabulary. Cranial nerves were intact. Motor exam showed a normal strength with 5/5 in all muscle groups tested. She had normal tone and bulk, no atrophy or fasciculations noted. Her sensory exam noted an absence to light touch distally to ankle, then reduced higher bilaterally in her lower extremities. Decreased sensation in her upper extremities to above the wrist. Vibratory sensation absent in the bilateral lower extremities and mildly reduced distally in the bilateral upper extremities. She had intact finger -nose-finger coordination. There was no cerebellar rebound or drift; no tremors, and once again, her gait demonstrated a

normal pattern with no reference to her use of an assistive device. (Ex. 34F / 42-43) Dr. Rosenberg concluded the claimant had a sensory polyneuropathy "probably from DM." He recommended Lidoderm patches for use on her feet and suggested she return to the CPAP clinic to look at alternatives for treating her OSA because she "doesn't wear the mask." He also recommended that she look for other causes of sensory neuropathies which included orders for testing of lyme antibodies, paraneoplastic ABS, electrophoresis, hepatitis C and others.

(*Id.* at PageID #: 2740, 2742-44).

### B.  Opinion Evidence at Issue

The opinions of Dr. Megan Testa and Dr. Mary Behmer are at issue on appeal.[1]  The ALJ summarized Dr. Testa's opinion that Claimant had "work-preclusive mental limitations, impairments that . . . would cause excessive absenteeism and off task behavior (see Ex. 37F). In support of her opinions, Dr. Testa said the claimant suffered from 'severe anxiety, hypervigilance, poor concentration' and 'depression with low motivational energy.'"  (ECF No. 8, PageID #: 2746-47).  As to Dr. Behmer, the ALJ did not detail the opinions other than describing them as "less than sedentary opinions" and referencing an exhibit in the record.  (*Id.* at PageID #: 2747).  The cited exhibit is a medical source statement indicating Claimant can sit for twenty minutes before needing to get up; can stand for five minutes before needing to sit down or walk around; can sit and stand/walk for less than two hours in an eight-hour working day; will need breaks to walk for about ten minutes every fifteen minutes; will need to law down hourly for thirty minutes to relieve pain; and would likely be absent more than four days per

---

[1] Claimant also asserts that the "ALJ discounted the opinion of Dr. Henry Tucker who in November 2015 limited Plaintiff to 20 minutes of standing."  (ECF No. 11-1 at 32).  However, Claimant fails to further develop this argument such that the Court deems it waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

month.  (*Id.* at PageID #: 6315-17).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act
   through March 31, 2021.

2. The claimant did not engage in substantial gainful activity between the January
   12, 2015, alleged onset date and December 31, 2016 (20 CFR 404.1520(b),
   404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant engaged in substantial gainful activity between January 2017 and
   April 2017 (20 CFR 404.1520(b), 404.1571 *et seq.,* 416.920(b) and 416.971 *et
   seq.*).

4. The claimant has not engaged in substantial gainful activity since May 1, 2017
   (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

5. Notwithstanding Finding 3, the findings that follow are made under the
   presumption that the claimant has not engaged at any time since the January 12,
   2015, alleged onset date.

6. The claimant has the following severe impairments: obesity; diabetes with
   associated neuropathies; psoriasis; coronary artery disease, status post bypass
   grafting of three vessels; a healed fracture of the shaft of the left humerus; a
   surgically treated Dupuytren's contracture involving the right hand; surgically
   treated right cubital tunnel syndrome; cervical degenerative disc disease; lumbar
   degenerative disc disease; chondromalacia and cartilage damage in the left knee; a
   ventilatory defect (likely due to obesity); bipolar disorder and a related major
   depressive disorder; and post-traumatic stress disorder (20 CFR 404.1520(c) and
   416.920(c)).

7. The claimant does not have an impairment or combination of impairments that
   meets or medically equals the severity of one of the listed impairments in 20 CFR
   Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
   416.920(d), 416.925 and 416.926).

8. The claimant had the residual functional capacity between the January 12, 2015,
   alleged onset date and March 11, 2018 to perform light work as defined in 20
   CFR 404.1567(b) and 416.967(b) without any memory or social limitations
   subject to the following non-exertional limitations:

- She could not climb ladders, ropes, or scaffolds.
- She could frequently climb ramps and stairs.
- She could frequently balance.
- She could frequently stoop.
- She could frequently kneel.
- She could frequently handle and finger with the right dominant, upper extremity.
- She could occasionally kneel.
- She could not work on unprotected heights.
- She could not operate dangerous moving machinery such as power saws and jack hammers.
- She could not engage in commercial driving.
- She could not have concentrated exposure to temperature extremes or humidity.
- She could maintain concentration, persistence, and pace for work tasks that do not have strict production quotas for time or quantity such as work based on a mechanized pace.

9. The claimant has had the residual functional capacity since March 12, 2018 to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), provided she can alternate between sitting, and standing and walking, every hour without being off task, subject to the following nonexertional limitations:
- She cannot climb ladders, ropes, or scaffolds.
- She can frequently climb ramps and stairs.
- She can frequently balance.
- She can frequently stoop.
- She can frequently kneel.
- She can frequently crouch.
- She can frequently handle and finger with the right dominant, upper extremity.
- She can frequently reach overhead with the left, non-dominant upper extremity.
- She can occasionally kneel.
- She cannot work on unprotected heights.
- She cannot operate dangerous moving machinery such as power saws and jack hammers.
- She cannot engage in commercial driving.
- She cannot have concentrated exposure to temperature extremes or humidity.
- She can maintain concentration, persistence, and pace for work tasks that do not have strict production quotas for time or quantity such as work based on a mechanized pace.
- She can interact with co-workers, supervisors, and the public to ask questions, clarify instructions, gather information, serve others, and point or direct where items may be placed.
- She cannot engage in tasks that require conflict resolution.

18

10. The claimant has not been able to perform her past relevant work since the January 12, 2015, alleged onset date (20 CFR 404.1565 and 416.965).

11. The now 42-year-old claimant has been a younger individual in the 18 to 49 age group ever since the January 12, 2015, alleged onset date when she was 35-years-old (20 CFR 404.1563 and 416.963).

12. The claimant has a high school education (20 CFR 404.1564 and 416.964).

13. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

14. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

15. The claimant has not been under a disability, as defined in the Social Security Act, from January 12, 2015, through the date of this decision (20 CFR 404.1520(9) and 416.920(9)).

(ECF No. 8, PageID #: 2717-19, 2722, 2724-25, 2749, 2751).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

19

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available

work in the national economy. *Id.*

## C. Discussion

Claimant raises three issues on appeal.  First, she argues the ALJ failed to follow the order of the Appeals Council by failing to provide sufficient rationale to support the limitations in the RFC.  Next, she argues the ALJ erred when she found Claimant did not satisfy the criteria of Listing 8.05.  Finally, she argues the ALJ failed to adequately explain why she failed to give controlling weight to the opinions of treating sources over those of state agency reviewers.

### 1.  The ALJ complied with the order of the Appeals Council.

Claimant argues the ALJ failed to comply with the order of the Appeals Council because she "failed to consider the totality of the medical evidence in this matter."  (ECF No. 11-1 at 27). Specifically, she argues the ALJ failed to adequately consider the combined impact of Claimant's diabetes, neuropathy, and obesity in determining Claimant's RFC.  (*Id.* at 17, 20, 23). Additionally, she argues the ALJ cherry picked the evidence in the record when concluding Claimant had only a moderate limitation in concentration, persistence, or pace "as she did not seem to have any significant problems maintaining her attention and concentration during the hearings."  (*Id.* at 24).  The Commissioner argues the ALJ did not err because she adequately considered the cumulative effects of Claimant's impairments, considered the medical evidence in the record in addition to her own observations in determining Claimant had only a moderate limitation in concentration, and was "not required to meticulously recite every piece of evidence" because it is clear she considered the whole record.  (ECF No. 12 at 13-14).  Claimant replies that the Court may not accept Commissioner's "*post hoc* rationalization" to support of the ALJ's decision.  (ECF No. 14 at 2 (citing *Revello v. Commissioner of Social Security*, No. 5:20-cv-

21

01860, 2021 WL 6064784, at *6 (N.D. Ohio Dec. 22, 2021))).

The record reflects that the ALJ considered Claimant's diabetes, neuropathy, and diabetes but found that the medical record did not support that such warranted further physical restrictions than those encompassed by the RFC.  As the ALJ explained:

> With respect to specifically to the claimant's diabetes and associated neuropathies, the undersigned is not persuaded these problems have caused any significant limitations in terms of the claimant's ability to walk, stand, or use her upper extremities. In support of this determination, the undersigned notes that this record, on balance, contains relatively few complaints concerning either the claimant's diabetes or her associated neuropathy. Indeed, the claimant has denied suffering from numbness or tingling in her joints on multiple occasions since the January 12, 2015, alleged onset date. While the podiatrist noted decreased sensation in her feet, she did not use an ambulatory aid because of her neuropathy. While the claimant reported using a walker for the past year and a shower chair before her CABG surgery due to her concerns of loss of balance, the evidence does not support this assertion nor the actual medical necessity for same as a result of neuropathy. First, she reported on June 4, 2019, in a follow up visit with orthopedics, that her primary concern was a recent development in *chest pain* when walking. Specifically, she told her orthopedic physician that "over the last several weeks, she has developed *an exertional chest discomfort.*" She initially thought it was from her shoulder, but has since reconsidered that. "She requested a walker from her primary care physician because she wanted a place to rest while she was walking." She denied any new trauma or injury and no cardiac history. (Ex. 25F/ 64) She made no mention of needing the walker due to neuropathic symptoms. The record documents the claimant's telephone request for a walker on May 31, 2019. (Ex. 25F/ 66) The reason she gave was: "her leg does not allow her to walk more than 500 ft without having to stop and take a seat to rest." No other reference to her use or need for a walker for diabetic neuropathic symptoms in her feet. Instead, she reported the symptom of chest pain as the concerning symptoms and need for use of a walker when the following year she had an evaluation for her abnormal stress test. Hence, there does not appear that anyone properly documented her symptoms or document the medical need for the walker for neuropathy reasons. (Ex. 23F/ Ex. 25F; 27F and Ex 28F].
>
> . . .
>
> The undersigned notes next that the claimant's obesity which has steadily increased since the January 12, 2015, alleged onset date. So had the claimant's diabetes, an impairment the claimant has not effectively managed by following

prescribed medical advice. Per her endocrinologist, she did not properly manage her condition before her CABG procedure, but since then and a change in her diet, her A1c test value significantly went down from 13 to 8.9 around the time of her CABG (Ex. 28F/20-22; 79) Notwithstanding this latter point, based on the evidence referenced above concerning the claimant's physical functioning, the claimant has still been able to occasionally lift and carry up to 20 pounds despite her obesity, diabetes, and other physical impairments, and medical non-compliance. Giving some consideration but not fully accepting her report of symptoms, the undersigned also finds the claimant has not been able to constantly handle and finger with her dominant, right upper extremity secondary to various right upper extremity impairments. Nor has she been able since March 12, 2018 to constantly reach overhead with her non-dominant, left upper extremity secondary to her healed, left humerus fracture.

ECF No. 8, PageID #: 2738-39, 2741.

Based on the above discussion, the Court does not agree with Claimant that the ALJ failed to comply with the order of the Appeals Council.  The record shows the ALJ considered the entire record when determining the combined effects of the various conditions on Claimant's RFC. Even with her impairments, the ALJ found Claimant could perform light work, modified to only frequently (as opposed to consistently) climb ramps, balance, stoop, kneel, crouch, and handle and finger with her right hand.  (*Id.* at PageID #: 2725).  There is substantial evidence to support the ALJ's conclusion.

As to Claimant's mental limitations, contrary to Claimant's argument, the ALJ did not rely solely on her own observations of Claimant at the hearing in determining that she did not have significant problems maintaining attention and concentration.  In addition to the fact that Claimant "did not have problems concentrating or maintaining her attention during four hearings," the ALJ noted that Claimant had not "complained of significant problems concentrating, persisting at tasks, or pacing herself;" had been described "as being alert and oriented on most, if not all, of the occasions since January 12, 2015;" and had been described on

different occasions as "having normal attention and/or concentration." (ECF No. 8 at PageID #: 2721-22). Thus, the ALJ did not rely "solely on her observations at the hearing" and did not err in her analysis of Claimant's mental limitations. *Pruitt v. Comm'r of Soc. Sec.,* No. 4:22-CV-901, 2023 WL 2937672, at *10–11 (N.D. Ohio Jan. 26, 2023), *report and recommendation adopted sub nom. Pruitt v. Comm'r of Soc. Sec. Admin.*, No. 4:22-CV-901, 2023 WL 2931041 (N.D. Ohio Apr. 13, 2023).

Claimant is certainly correct that "courts may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Revello*, 2021 WL 6064784, at *6. In *Revello*, the court found that the ALJ decision contained only "minimal discussion" with no "substantive consideration of the limitations" from specific health conditions. *Id.* Thus, that court concluded remand was warranted because "the court's role is not to engage in guesswork or to supply reasoning not stated by the ALJ." *Id.* Here, however, the ALJ provided a detailed discussion of Claimant's conditions and reasons why the medical record did not warrant greater limitations. (ECF No. 8, PageID#: 2738-39, 2741). Thus, unlike in *Revello*, the Court finds sufficient justification in the decision itself and does not rely on any after-the-fact justifications.

Accordingly, the ALJ complied with the Appeals Council's order and considered the record as a whole in reaching her decision.

## 2. The ALJ did not err in finding Claimant did not meet Listing 8.05.

Claimant next argues the ALJ committed harmful error when she failed to find that Claimant satisfied the criteria of Listing 8.05 because the record established that she had the requisite skin lesions which persisted for at least 3 months despite continuing treatment as

24

prescribed.  (ECF No. 8 at 27-28).  The Commissioner responds that while Claimant "points to the mere existence of the lesions, she makes no meaningful effort to show that they resulted in the very serious limitations required by the Listing" and fails to address the ALJ's contrary findings based on the medical opinion evidence.  (ECF No. 12 at 17-18).

At Step Three, an ALJ considers whether a claimant's impairment is severe enough to prevent them from completing gainful activity.  *See* 20 C.F.R. § 404.1525.  If an impairment meets or equals a "Listing of Impairments," they are presumed disabled.  *Id.*; *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 710 (6th Cir. 2013) ("A claimant who meets or equals a listed impairment is presumptively disabled, without consideration of her age, education, or work experience.").

Listing 8.05 applies to "[d]ermatitis (for example, psoriasis …), with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed."  20 C.F.R Pt. 404, Subpt. P, App. 1, §8.05.  For purposes of Listing 8.05, "[e]xtensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation."  *Id.* at § 8.00(C)(1).  The examples of when skin legions cause a very serious limitation include when they "very seriously limit" use of more than one extremity, fine and gross motor movements, or ability to ambulate.  *Id.*

Concerning Listing 8.05, the ALJ found:

The claimant's psoriasis has not met or medically equaled the severity called for by Listing 8.05 because it has not caused "extensive fungating or extensive ulcerating skin lesions that persist for at least 3 months despite continuing treatment as prescribed." This includes 2017, the year the claimant was hospitalized secondary to psoriasis. On this point, the undersigned does not find that the psoriatic plaques the claimant had between January 2017 and June 2017 represent "extensive lesions." Moreover, the claimant engaged in disqualifying

25

substantial gainful activity between January 2017 and April 2017 (see Finding 3 above).

(ECF No. 8, PageID #: 2724). While Claimant is correct that the reference to "extensive fungating or extensive ulcerating skin lesions" is not the standard set out in Listing 8.05, the Court agrees with the Commissioner that any error is harmless because the ALJ "made sufficient factual findings elsewhere in [her] decision to support [her] conclusion at step three" that Claimant's skin lesions did not result in a very serious limitation. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). The ALJ noted that "the psoriatic complaints the claimant has had since her 2017 flareups were treated, have been, on balance, minimal;" Claimant's medical records "include many references to the claimant not having any skin lesions;" Claimant's 2018 testimony that she was looking for work as a receptionist was inconsistent with her allegation that she had significant problems using her hands; and the medical record showed Claimant requested a walker due to chest pain rather than any documented inability to ambulate. (ECF No. 8, PageID #: 2739, 2742). Additionally, the ALJ noted that "no medical source has identified evidence showing that the claimant has had a listing-level impairment(s) at any time over the last seven-plus years." (*Id.* at 2722). Thus, the ALJ did not err or finding Claimant did not meet or equal Listing 8.05.

**3. The ALJ adequately explained the weight given to the treating source opinions.**

Claimant finally argues that the ALJ erred when she failed to adequately explain why she did not give controlling weight to the opinions of treating sources—specifically Dr. Behmer and Dr. Testa—and instead placed great significance on the October 2015 and March 2016 evaluations of the State Agency reviewing psychologists. (ECF No. 8 at 29, 31-33). As a sub

26

argument, Claimant asserts that because the "ALJ also found that the original state agency physicians were only entitled to little weight and the reviewers from the second application were accorded partial weight . . . it is unclear as to what opinions were relied on by the ALJ when she made her RFC determination."  (*Id.* at 32).

Under the treating source rule,[2] an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting § 404.1527(d)(2) (eff. to July 31, 2006))).  "It is error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record."  SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blankley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2).  "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight,

---

[2] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017.  *See* § 416.927.  Claimant filed her initial claim before the revision took effect.

the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011); (20 C.F.R. § 404.1527(c)(2).  "These reasons must be 'supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96-2p, 1996 WL 374188, at *5). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'"  *Id.*   The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards.  *Cole*, 661 F.3d at 939.

### a.  Dr. Testa

Dr. Testa opined that Claimant suffered from severe anxiety, hypervigilance, poor concentration, and depression with low motivational energy which were "work-preclusive" and would cause excessive absenteeism and off task behavior.  (ECF No. 8, PageID #: 2746).  The ALJ gave little weight to this opinion, stating:

> The evidence does not show the degree of dysfunction Dr. Testa described over any continuous 12-month period since the January 12, 2015, alleged onset date. Indeed, the claimant has described herself on numerous occasions since January 12, 2015 as not being anxious or depressed. There are also few, if any, objective observations regarding problems the claimant has had concentrating or maintaining her attention. There has been, however, multiple instances when the claimant has been described as having normal attention. The claimant has also been regularly described as having normal behavior.
>
> Besides not being supported by the weight of the evidence concerning the claimant's mental functioning, Dr. Testa's opinions are inconsistent with the opinions on the State agency psychologists who reviewed this matter at different times over the last seven-plus years since the January 12, 2015, alleged onset date,

28

opinions that the undersigned has placed greater significance on because she finds their opinions better match the evidence concerning the claimant's mental functioning.

(*Id.* at PageID 2746-47).

The Commissioner argues that when the ALJ's decision is read as a whole, "it is apparent the ALJ identified substantial evidence constituting good reasons for assigning little weight to Dr. Testa's opinion."  (ECF No. 12 at 24.)  The Court agrees.

First, substantial evidence supports the ALJ's decision to withhold controlling weight from Dr. Testa's opinion that Claimant's mental impairments were "work-preclusive."  Earlier in the decision, the ALJ set forth multiple instances where Claimant denied suffering from anxiety or depression and noted that she had been described as "not being in distress on almost every occasion since January 12, 2015."  (ECF No. 8 at PageID #: 2736).  The ALJ also provided a detailed list of reasons she believed Claimant's mental functioning did not warrant additional limitations, including her ability to live alone, utilize public transportation, interact with medical providers, maintain a relationship with her boyfriend, use Facebook, and follow medical treatment.  (*Id.* at PageID #: 2744-46).  This evidence supports the ALJ's decision that Dr. Testa's opinion was inconsistent with and unsupported by the record.

The ALJ also provided good reasons for assigning little weight to the opinion.  The ALJ noted that there were "few, if any, objective observations regarding problems the claimant has had concentrating or maintaining her attention" and Claimant's own description of herself "on numerous occasions since January 12, 2015 as not being anxious or depressed."  (*Id.* at PageID #: 2746).  In addition to not being supported by the evidence, the ALJ noted that Dr. Testa's opinion was inconsistent with those of the state agency consultants.  (*Id.*)  To the extent Claimant

29

argues the ALJ erred in relying on the state agency consultants' opinions because "[t]hese reviewers did not have the opportunity to review the entire record, and no evidence for approximately seven years prior to the determination," the Court finds this argument meritless. (ECF No. 11-01 at 33).  As the Commissioner indicates in response, while two opinions were rendered in 2015 and 2016, these opinions were subsequently reviewed and adopted again in 2020 with citations to additional medical records from the time after the original opinions were issued.[3]  (*See* ECF No. 8, PageID #: 2796-99, 2805-08, 2815-2818).

Thus, because substantial evidence supports the ALJ's decision to decline to give Dr. Testa's opinion controlling weight and the ALJ provided good reasons for instead assigning the opinion little weight, the ALJ did not err.

### b.  Dr. Behmer

The ALJ also assigned little weight to Dr. Behmer's "less than sedentary opinions," finding:

> they are not supported by the weight of the evidence concerning the claimant's physical functioning, including the evidence referenced in this decision of normal physical examination findings. She appeared to accept the claimant's report of the severity of the symptoms without objective analysis of treatment notes and clinical findings. For example, she stated the claimant had "disabling pain in her hands and feet." She also referenced use of a walker. To this point, the undersigned notes Dr. Behmer's description of the claimant as relying upon a walker to ambulate are not supported by the claimant's medical records, records

---

[3] Claimant also seems to argue that the ALJ erred because she did not rely on any one opinion in crafting her RFC. (*See* ECF No. 11-1 at 32).  Because Claimant did not develop this argument, the Court deems it waived. *McPherson*, 125 F.3d at 995-96.  Even if not waived, the argument fails because "[w]hen assessing a claimant's RFC, an ALJ 'is not required to recite the medical opinion of a physician verbatim . . . [and] an ALJ does not improperly assume the role of medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Mitchell v. Comm'r of Soc. Sec.*, No. 1:20-cv-00430, 2021 WL 1146923, at *11 (N.D. Ohio Jan. 15, 2021), *report and recommendation adopted sub nom. Mitchell v. Comm'r of Soc. Sec.*, No. 1:20-cv-00430, 2021 WL 1146358 (N.D. Ohio Mar. 25, 2021).

which do not speak to the need for her to use an assistive device to ambulate over any continuous 12-month period since January 12, 2015. (See also more recent examinations Ex. 32F/ 171 and Ex. 34F/ 42-43).

(ECF No. 8, PageID #: 2747).

The Commissioner argues the ALJ's "broader analysis of the medical evidence and Plaintiff's subjective complaints … established good reasons supported by substantial evidence for the assignment of little weight to Dr. Behmer's opinion." (ECF No. 12 at 22). The Court again agrees.

While Dr. Behmer's opinion limited Claimant to less than sedentary work, the ALJ's detailed discussion of Claimant's medical history noted multiple occasions where she was observed has having a normal gait and range of motion. (ECF No. 8, PageID #: 2736). The ALJ also noted that the medical record did not support Claimant's need for a walker or other assistive device for an extended period of time. (*Id.* at PageID #: 2747). Thus, substantial evidence supports the ALJ's decision to decline to give Dr. Behmer's opinion controlling weight.

The ALJ also provided good reasons for assigning Dr. Behmer's opinion little weight. In addition to being inconsistent with the medical record, the ALJ noted that Dr. Behmer's opinion appeared to be based on Claimant's own reports unsupported by objective analysis. (*Id.*); *see Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 257-58 (6th Cir. 2016) (finding remand unwarranted where ALJ assigned little weight to treating source's opinion when it was based on claimant's "subjective complaints rather than objective medical evidence"). Because substantial evidence supports the ALJ's decision to decline controlling weight to Dr. Behmer's opinion and because the ALJ provided good reasons for assigning the opinion little weight, the ALJ did not

violate the treating source rule. [4]

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's

Statement of Errors and AFFIRM the Commissioner's decision.

Dated: 9/21/2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).

---

[4] To the extent Claimant's argument regarding Dr. Tucker is not waived, the Court finds it meritless because substantial evidence supported the ALJ's decision to decline controlling weight to his opinion.  Similar to Dr. Behmer's opinion, Dr. Tucker's opinion indicated Claimant's "[s]tanding is limited to 20 minutes continuous." (ECF No. 8, PageID #: 2747).  The ALJ noted that "Dr. Tucker did not reference any evidence in support of [his opinion], and . . .  the evidence concerning the claimant's ability to stand and walk, including the evidence referenced in this decision as outlined in copious detail above, does not support his opinions."  (*Id.*).  The ALJ also provided good reasons for assigning the opinion little weight, citing that Claimant's "physical examinations have documented most often an intact gait, mostly full spinal range of motion and occasionally reduced, generally normal muscle strength, muscle tone and bulk, and more often neurological findings that do not support [Dr. Tucker's] restrictive limits."  *Id.*